MEMORANDUM OF DECISION
CT Page 10168
This memorandum of decision affects four minor children, Raheene P., Da-Shon M., Quadeace B. and Hailequasha E.,[2] whose parents are the subject of petitions for termination of their parental rights (TPR). On November 16, 1998, the Department of Children and Families (DCF) filed TPR petitions against Ann M. and Brian P.,[3] the biological parents of Raheene, who was born on June 1988; against Ann M. and Kenny J., the biological mother and putative father of Da-Shon, who was born on May 1989; against Ann M. and Winston B.,[4] the biological parents of Quadeace, who was born on October 1990; and against Ann M. and Haile E., the biological parents of Hailequasha, who was born on August 1992.
As to Brian P., the petition alleges abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship.[5] The court finds these matters in favor of the petitioner.
As to Winston B., the petition alleges abandonment and lack of an ongoing parent-child relationship. Service by publication was confirmed as to this respondent on January 5, 1999. (Rogers, J.) However, despite due notice of these proceedings, Winston B. has failed to appear or to participate, and was defaulted by this court on November 16, 2000, at the commencement of trial. The court finds these matters in favor of the petitioner.
As to Kenny J., the petition alleges abandonment and lack of an ongoing parent-child relationship. Kenny J. was not the first identified father for this child, and the TPR petition against him was filed on June 5, 2000 as an addendum. (See Exhibits 2, 3, 4.) Kenny J. received notice by court-ordered publication, and was defaulted after service was confirmed on November 16, 2000. The court finds the matters pending against Kenny J. in favor of the petitioner.
Haile E. is deceased. (Testimony of Ann M.; Exhibit 4.)
As to Ann M., the petitioner has proceeded on the grounds of failure to rehabilitate, and acts of omission or commission, as to each of the children who are the subject of this petition. For the reasons stated below, the court finds the issues related to rehabilitation in favor of the petitioner. On June 5, 1996, following a court hearing, Raheene, Da-Shon, Quadeace and Hailequasha were adjudicated neglected children, and were committed to DCF for a period of twelve months. (Brenneman, J.) That commitment has continued without a hiatus.
This highly contested termination of parental rights trial was heard on November 16, 17, 20, 21, 22 and December 19, 2000; March 14, 15 and April CT Page 10169 3 and 4, 2001. Written argument on the subject of the ground of omission or commission was submitted on April 26, 2001. Ann M. was present at each court session with her attorney. Brian P., the petitioner and the minor children were represented by their respective counsel throughout the trial.[6]
The Child Protection Session, Superior Court for Juvenile Matters, has jurisdiction over the pending matter. No action is pending in any other court affecting custody of the children at issue.
 I. FACTUAL FINDINGS
The parties introduced an extensive quantity of evidence at trial, including reports from four separate psychologists, documents reflecting services from numerous providers, multiple social studies, photographs and correspondence. The parties also conducted exhaustive and intensive direct and cross-examination of multiple witnesses including psychologists, other mental health service providers, DCF staff members, foster parents and Ann M.[7]
Having considered the verified petitions and all of the documentary and testimonial evidence according to the standards required by law,[8] the court finds that the following facts were proven by clear and convincing evidence at trial:
A. ANN M., THE MOTHER
 1. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF JUNE 5, 1996
Ann M. was born May 24, 1970. She has given birth to eight children, including the four who are the subject of this petition.[9] Each child has a separate father. (Exhibits 8, 10.) After being deserted by her mother, Ann M. was raised by her paternal grandmother; she was physically abused as a child. (Exhibits 9a, 43.) She was expelled from school after completing the tenth or eleventh grade. (Exhibits 8, 9a, 10.) Ann M. has worked as nurse's aide and at a fast food restaurant. (Exhibits 2, 10.)
Ann M.'s first child, Raheene, was born on June 1988. Da-Shon followed on May 1989. Quadeace B. was born on October 1990, and Hailequasha E. was born on August 1992. Moeties was born on August 1993.[10]
Ann M.'s family came to the attention of DCF in December of 1993, upon report that a fire had occurred while she had left five of her children at home alone. (Exhibits 1, 8, 5; Testimony of Phyllis H.)[11] Ann M. was directed to the DCF Crisis Center Intervention unit, but she failed to cooperate with that service. (Exhibit 1; Testimony of Dr. Adamakos.) CT Page 10170
In March 1994, DCF found that Ann M. had left her children unattended again. (Exhibit 1.) DCF and Ann M. entered into a service agreement wherein she promised not to leave the children without supervision by a responsible adult. (Exhibit 12; Testimony of Phyllis H.) However, in August 1994, Ann M. again left her children unattended at home. (Exhibit 1.) DCF obtained an Order of Temporary Custody (OTC), and Raheene and Da-Shon were placed with Carol M., their maternal aunt, on August 12, 1994. The OTC was vacated on August 19, 1994 (Brenneman, J.) at which time the boys were returned to Ann M.'s care. (Exhibits 1, 2.) From August of 1994 to October 1994, Quadeace lived in Jamaica with her father and paternal grandmother, and then returned to Ann M.'s care. (Exhibits 1, 8.)
DCF then began a long and involved process of tendering an extensive range of rehabilitative services to Ann M. DCF referred Ann M. to Hall Neighborhood House Intensive Family Preservation Program (IFP), but she failed to derive measurable benefits from this service.[12] During this IFP period, Ann M. did not always address her children's basic needs for food and clothing, again left them unattended, and appeared focused upon her personal needs.
In November 1994, the court determined that Ann M. should no longer serve as Hailequasha's guardian.[13] In April 1995, Ann M. began receiving long-term parenting assistance through Child Guidance.[14]
During April 1995, Ann M. commenced parenting classes at Family Services Woodfield (FSW), but she soon discontinued attendance. (Testimony of Michelle C.) After leaving Raheene and Da-Shon unattended again, the court removed them from Ann M.'s care on July 27, 1995, and placed them with Carol M. (Melville, J.) (Exhibits 1, 2.)
On May 2, 1996, Ann M.'s sixth child Ta'Zaeya M. was born. Her medical needs include asthma and sickle-cell trait. (Exhibit 2.) From September 1995 through January 1996, DCF re-extended IFP's services to Ann M. However, she did not finish this program, again cooperating only for six weeks. (Testimony of Michelle C.)
2. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF JUNE 5, 1996
On June 5, 1996, the court found Raheene, Da-Shon, Quadeace and Hailequasha to be neglected, and they were committed to DCF.[15]
(Brenneman, J.) Raheene and Da-Shon were placed with Carol M., while Quadeace and Hailequasha were placed in non-relative DCF foster care. (Exhibit 2.) On August 19, 1996, court expectations were ordered for Ann M. (Brenneman, J.) The steps included participation in individual and parenting counseling, cooperation with a parent aide and Child Guidance, CT Page 10171 and visitation with the children as often as DCF permits.[16] (Extibit 5.)
Johnny Ray B. was born on May 1997, and Patrick Peat M. was born on June 1998.
After the neglect adjudication involving the older children, DCF continuously provided efforts at reunification, despite the fact that Ann M. showed no more inclination to actively participate in her rehabilitation process than she had before the second removal of these children from her care. Ann M. failed to cooperate with a long roster of DCF's referrals and re-referrals to multifaceted providers, many of whom terminated their services when she refused to attend scheduled sessions or attended sporadically, missed appointments, did not fulfill program requirements, rejected referrals to other agencies, or demonstrated a lack of trust, hostility or unreasonable resistance to service workers and their recommendations. Thus, Ann M. only minimally participated in counseling at Catholic Family Services (CFS); parenting counseling and a series of parenting classes at Child Guidance; mental health treatment for depression and family counseling at FSW; case management services, parenting groups and individual counseling through FSW's Family Strengthening team (FSW-FST); psychiatric follow-up as recommended at Guenster Rehabilitation (Guenster); additional family counseling at FSW; parenting classes sponsored by the YWCA; counseling for anger and depression at the ABC Outreach program; or additional parenting classes held at the Kennedy Center. (See Exhibits 5, 23, 28, 39, 42; Testimony of Susan B., Dawn H., Michelle C.)
Despite the panoply of services extended, Ann M. still required concrete instruction in how to keep her younger children safe, obtain medical care, properly feed them, and develop nurturing child care practices. Accordingly, DCF referred her to Boys Village Youth and Family Services, Inc. (Boys Village):[17] the agency provided in-home services for Ann M. and her younger children from September 1998 through April 1999.[18] (Testimony of Shane M.; Exhibits 23, A.) When seven months of services to Ann M. had ended, Boys Village recommended that she attend parent support groups and allow a weekly visit by a parent aide. However, Ann M. would not follow through with these services, even with DCF's support. (Testimony of Shane M.; Exhibits 23, A.)
In June 1998, at DCF's referral, Ann M. had started individual counseling with Irene I., M.S.W., L.C.S.W., a licensed clinical social worker at Jewish Family Services (JFS). At DCF's direction, Irene I. provided counseling for self-esteem, stress management, communication, anger management and improvement of judgment; in response to needs observed by Irene I., parenting skills and stress management were added. CT Page 10172 (Exhibits I, J; Testimony of Irene I.) Like the others who had evaluated her, Irene I. noted that Ann M. had a low affect and was emotionally unavailable to her children. She referred Ann M. to Dr. J. Howland, a JFS psychiatrist who prescribed anti-depressant medication for her.[19]
(Exhibit A; Testimony of Irene I.) Commencing in December of 1998, Irene I. provided multiple individual counseling sessions at Ann M.'s home, and then the therapy resumed at JFS offices. (Exhibit K; Testimony of Irene I.)
On October 30, 1998, the court (Rogers, J.) found that continuing reunification efforts were not appropriate as to Ann M., Brian P. and Winston B.
3. EVENTS AFTER THE FILING OF THE TERMINATION PETITIONS ON NOVEMBER16, 1998
In early summer 1999, Ann M. stopped attending individual counseling sessions with Irene I., due to unspecified conflicts with her work and education schedules.[20] (Testimony of Irene I.; Exhibit 45.) A year later, in June of 2000, Ann M. recommenced her individual counseling with Irene I. Although Irene I. promptly referred Ann M. to Dr. Renata Weissberg, a JFS staff psychiatrist for a psychiatric consultation, she did not attend that session until October, 2000, at which time her anti-depressant regimen was modified. (Testimony of Irene I; see Exhibit X.)
4. ANN M.'s CRIMINAL HISTORY
Ann M. engaged in numerous criminal activities both before and after the court's imposition of the specific steps in August 1996. In August 1994, she was charged with Risk of Injury (§ 53-21) in response to the fire which had occurred in late 1993. (Exhibits 1, 7.) In May 1995, she was charged with Assault in the Third Degree (§ 53a-61). In December 1995, Ann M. was arrested and charged with Larceny in the Sixth Degree (§ 53a-125b); this charge was disposed of by conviction, and imposition of a $50 fine on April 3, 1996. On December 2, 1997, Ann M. was convicted of the pending Risk of Injury charge and was sentenced to three years of incarceration, suspended, with three years of probation, and received an unconditional discharge. She was sentenced to unconditional discharge after conviction on the pending assault charge and Failure to Appear (§ 53a-173), related to a scheduled July 1995 court appearance. (Exhibit 7.)
5. ANN M.'s PSYCHOLOGICAL EVALUATIONS
In a continuing effort at reunification, DCF obtained a series of CT Page 10173 psychological evaluations for Ann M., and ". . . .repeatedly attempted to determine what the [respondent's] mental health issues were and how best to address [her] problems." In re Ashley S., 61 Conn. App. 658, 660, ___ A.2d ___ cert. denied, 255 Conn. 950, ___ A.2d ___ (2001). In September 1994, Ann M. attended her first court-ordered psychological evaluation, conducted by Harry Adamakos, Ph.D.[21] In December 1995, Ann M. underwent a second court-ordered psychological evaluation by Ralph Welsh, Ph.D., a diplomate in clinical psychology with many years of experience in child and family matters.[22] Carol Swenson, Ph.D., a licensed clinical psychologist, performed the third court-ordered evaluation of Ann M. and her children in August 1997.[23] In the summer of 1999, Rodolfo Rosado, Ph.D., a skilled and experienced clinical psychologist, conducted the fourth full psychological evaluation of Ann M., with interactional evaluations involving the children as ordered by the court. (Brenneman, J.) Although Ann M.'s cooperation was generally poor, these serial evaluations consistently revealed her to have an average level of intelligence, a high level of anger, debilitating depression, poor judgment, and a significant lack of insight into her condition despite the services that had been rendered.
Lamentably, the evaluations also exposed Ann M.'s extraordinary inability to communicate with her children, to recognize their special needs as described in Part I. E., or to benefit from services. These deficits were apparent in Dr. Welsh's 1995 evaluation, when she demonstrated little interaction with her children, failed to appropriately respond when they asked her for assistance, and could not or would not intervene when they became aggressive or chaotic with their play or verbal squabbles.[24] (Testimony of Dr. Welsh; Exhibit 9d.) During Dr. Swenson's evaluations in 1997, Ann M. showed no physical or verbal affection to Raheene, Da-Shon, Quadeace or Hailequasha during their play periods, although some brief smiles were exchanged.[25]
(Exhibits 10; Testimony of Dr. Swenson.) When Dr. Rosado performed his interactional evaluation in 1999, Ann M. stated that she was happy to see her children and interacted well with Quadeace and Hailequasha. (Exhibit 11.) However, "her behavior [with Raheene] was rather lackluster and displayed blunted affect, which was inconsistent with her stated feelings," but consistent with her depression, and communication with Da-Shon "[u]nfortunately . . . lacked the emotional enthusiasm and overt behavioral expressions of affection that are normally associated with positive secure parent-child attachment relationships." (Exhibit 11.)[26]
B. BRIAN P., FATHER OF RAHEENE
Brian P. was born on August 1964. (See Exhibits 7, D.) A high school graduate, he has worked as a mechanic, a welder, and a truck driver. (Exhibits 1, 4.) He did not personally attend this trial. CT Page 10174
Between August 1997 and November 1998, Brian P. visited Raheene on one occasion. (Exhibits 4, 41.) In March 1999, when Brian P. was living at a Rescue Mission rehabilitation center, and receiving unspecified rehabilitation therapy, he requested that DCF provide visitation. However, Brian P. failed to keep his whereabouts or employment status known to DCF, thus preventing DCF from facilitating a visitation schedule. (Exhibit 4.) Brian P. also attempted, on one occasion in 1999, to visit Raheene at his school, but no other visits were noted after that date. (Exhibits 4, 41.)
Brian P. has a notable history of criminal convictions for acts of violence and failure to comply with court orders.[27] He failed to attend the court-ordered psychological and interactional evaluations with Dr. Rosado scheduled to take place in July 1999. (Exhibit 11.) Brian P. fails to consistently meet his child support obligations, and has accrued an arrearage of $39,000. (Testimony of Matthew B.) Brian P. has acknowledged substance abuse problems, for which he received treatment through LMG Programs, Inc. (LMG) from March through September 2000. LMG has expressed concern that after his discharge, Brian P. would return to live in an environment "that is not fully supportive to recovery" and noted that while Brian P. had received anger management treatment, his problems remained unresolved.[28] (Exhibit DD.)
C. KENNY J., FATHER OF DA-SHON
Kenny J. was born on February 4, 1970. Little is known about Kenny J. except that he has a history of drug related convictions and incarceration. (Exhibit 6.) No visits, contact or communication between Kenny J. and Da-Shon were reported to the court.
D. WINSTON B., FATHER OF QUADEACE
Winston B. has not visited with Quadeace under DCF's supervision. (See Exhibit 41.) However, in August 1998 and May 1999, he visited her foster home without DCF's knowledge. Winston B. has not acknowledged paternity of this child, and he has not participated in court proceedings, although he apparently knows where Quadeace lives. (Exhibit 4.)
E. THE CHILDREN
Raheene, Da-Shon, Quadeace and Hailequasha, are very attached to each other and visit together on a monthly basis, as arranged by their mutual foster families. The foster parents have all indicated a desire to adopt these children. (Testimony of James R., Cookie P.) CT Page 10175
1. RAHEENE AND DA-SHON
Raheene and Da-Shon have been in foster care with James and Orly R. since August 18, 1997 when they left Carol M.'s home for the last time. (Exhibit 10.) Their serious emotional difficulties have been addressed by their foster patents,[29] and through a wide variety of professional mental health services. Experiencing joys and vicissitudes, they have successfully adjusted to life in their foster home. (Testimony of James R.)
Raheene has received partial-hospital care at R.E.A.C.H. in response to displays of noncompliant and aggressive conduct. (Exhibits 4, W.) He was diagnosed with Oppositional Defiant Disorder (ODD) and Post Traumatic Stress Disorder (PTSD).[30] (Exhibits C, E.) In September 1998, Raheene came under the care of Cay W., M.D., a child and adolescent psychiatrist at Child Guidance.[31] Dr. W. determined "that [Ann M.'s] visits are having a negative impact on Raheene's educational, social and emotional functioning," and recommended suspension of visitation. (Exhibit 21; see also Exhibit 15.) Raheene received a long course of weekly counseling sessions with Karen M., a Child Guidance therapist who specializes in the treatment of children, and he has attended the Boys Village extended day program to further manage his behavior. (Exhibits F, 3, 4, 34; Testimony of Karen M.) By the spring of 2000, Raheene had so improved that Karen M. determined there was no longer need for mental health services. (Testimony of Karen M.) Raheene's extensive emotional issues and academic difficulties have also responded to intervention by his local school system, his foster parents, and DCF, and he has progressed from special education into a mainstream classroom. (Exhibits 3, 4, B; Testimony of Karen M.)
Da-Shon has received varied treatments for his serious emotional conditions. He commenced counseling therapy with Karen M. at Child Guidance in March 1997, to treat his Chronic Adjustment Disorder and Anxiety Disorder. (Exhibits 3, 14; Testimony of Karen M.) Although Da-Shon responded well to treatment, his progress was marred by insecurity and non-compliant behaviors which Karen M. attributed to the "inconsistencies of his visitations with his biological mother." (Exhibits 14, 16; Testimony of Karen M.) In August 1999, Karen M. recommended that Ann M.'s visits be discontinued to minimize the stress resulting from her failure to consistently spend time with Da-Shon. (Exhibit 16.)
During the first half of the following school year, Da-Shon displayed non-compliant and oppositional behaviors, and he attended the Boys Village program in lieu of counseling. (Exhibit G; Testimony of Karen M.) Da-Shon currently attends an alternative school where he receives special CT Page 10176 behavior management, and he receives the services of the Housatonic partial hospitalization program after school. (Testimony of James R.)
2. QUADEACE AND HAILEQUASHA
On June 5, 1996, Quadeace and Hailequasha were placed in foster care at the home of Cookie P., where they have since resided together. Their emotional issues have been addressed by their foster mother,[32] and through an array of professional services.
Like her brothers, Quadeace has suffered from serious emotional disturbances, including aggressive behaviors and resultant academic problems. DCF's Regional Resource Group provided psychological testing which showed that Quadeace had low-average intelligence, retarded emotional development, and Adjustment Disorder with mixed disturbance of emotions and conduct, perceived as detachment disorder. (Exhibits 2, 3, 38, N.; Testimony of Cookie P.)
To address her significant emotional needs, in February 1997 Quadeace commenced treatment at Child Guidance with Eva K., Ph.D., a clinical psychologist with long experience in the treatment of children, adolescents, their families and foster families. (Exhibits 17, 38; Testimony of Dr. K.) Quadeace also received medication therapy from Dr. W. (Testimony of Dr. W.; see also Exhibits 18, 38.) Like Raheene, Quadeace was twice treated at R.E.A.C.H. (Exhibits 3, 18, 38.) In response to her diminished symptoms of ADHD and ODD, Quadeace was able to stop her individual counseling, although she still receives medication and support from Child Guidance. (Exhibits 4, 18, 38; Testimony of Cookie P., Dr. W.) Quadeace repeated a grade in school, and issues of learning disabilities are being evaluated currently. (Exhibit 4; Testimony of Cookie P.)
In response to discordant behaviors ranging from emotional neediness to outbursts at school, Hailequasha also commenced psychological treatment with Dr. K. at Child Guidance in February of 1997. She suffers from Depression, Adjustment Disorder, pervasive anxiety, and a psychological fragility that makes her dependent upon the security provided by a stable and predictable home life. (Testimony of Dr. K., Dr. Rosado.) Hailequasha responded well to the therapy, and to her foster mother's use of appropriate management techniques. (Exhibits 18, 19.) However, in early spring of 2000, Hailequasha was seen again at Child Guidance with symptoms of clinical depression which Dr. K. directly related to Ann M.'s sporadic pattern of visitation:[33] At this psychologist's request, Ann M.'s visitation was suspended at that time.[34] (Exhibit 22.) Hailequasha is also being evaluated for learning disabilities, as her vocabulary development is slow. (Testimony of Dr. K., Cookie P.) CT Page 10177
3. ANN M.'s VISITATION WITH THE CHILDREN
Despite the specific step directing visitation with the children as often as DCF permits, Ann M.'s pattern of visitation was sporadic, at best. She attended barely more than half of the visits that were scheduled to take place from June of 1996 through the cessation of visitation in the spring of 2000, as recommended by the children's health care providers. (Exhibit 41.) On July 20, 1999, DCF summarized the effects of Ann M.'s perhaps unintentional but nonetheless distressing visitation performance: "[Ann M.] misses visits without canceling with DCF. [Ann M.] has a cellular telephone in addition to a home telephone; however, when she misses visits or is planning to arrive 45 minutes late for her one hour visit, she does not always contact DCF. She does not always want to stay for the entire visit. Mother continues to display a lack of emotion with these children and limited interaction with them during her visits. [Ann M.] does bring gifts and/or money to the children during visits. However, she may give one child a present, and then not give the other children gifts. [Ann M.] will also make promises of gifts to the children, which she does not follow through with . . . This mother sometimes favors one child over the others during visits, which causes emotional distress with the other children." (Exhibit 4.) As discussed in Part II. B. 1. b. Ann M.'s failure to participate in a consistent and predictable pattern of visitation had a significant adverse effect upon her children.[35]
 II. ADJUDICATION
As to the adjudicatory phase of this hearing,[36] the court has considered the evidence and testimony related to circumstances and events following the adjudication of neglect until the date the TPR petitions were filed or amended. As to the ground of failure to rehabilitate, pending against Ann M. and Brian P., the court has also considered relevant events occurring through the close of trial, as required bylaw.In re Eden F., 250 Conn. 674, 706, 741 A.2d 873 (1999); see also Practice Book § 33-3(a). The court has determined that a statutory ground for termination has been proved to exist as to each parent who is the subject of the pending petitions.
A. LOCATION AND REUNIFICATION
With respect to the statutory element requiring reasonable efforts at location and reunification, pursuant to General Statutes § 17a-112
(c)(1),[37] the court finds as follows:
1. ANN M. CT Page 10178
The court finds by clear and convincing evidence that DCF made reasonable efforts[38] to reunify Ann M. with her children, under the circumstances of this case, though the repeated provision of case management, multiple service agreements and visitation-related services; the IFP program and other parenting assistance as more specifically described at trial; and multiple psychological evaluations. See Parts I., III. A. 1. The court again notes that on October 30, 1998, the court (Rogers, J.) concluded that reunification efforts were not appropriate as to Ann M. and the older children. Consistent with this order and with the findings made herein, this court further finds that Ann M. is unable or unwilling to benefit from reunification efforts involving Raheene, Da-Shon, Quadeace or Hailequasha.
Ann M. has not suggested any relatives who could serve as adequate placement resources, and no appropriate relatives have offered alternative plans for the care of the children. Past placements of Raheene and Da-Shon with Carol M. had failed due to substantiated physical abuse. Ophelia W.'s ill health led to discontinuation of her care for Hailequasha. (Exhibit 4.)
Ann M. and DCF have encountered difficulties in communication. (See Exhibits 28, U, W; Testimony of Dawn H., Ann M.) Ann M. has threatened two DCF social workers who were assigned to her family. (Testimony of Phyllis H., Gina T.) This respondent alleges that the efforts of the subsequent worker, Michelle C., and DCF in general, were harassing in nature. (Exhibit U; Testimony of Irene I.) She complains that DCF did not help her enough, and should have done more. (Exhibit S.) However, the evidence provides no reasonable basis for crediting these assertions. Neither Ann M.'s conflict with her caseworkers nor DCF's level of service support constituted a significant barrier to the reunification of Ann M. with the older children.[39] Rather, as discussed throughout, Ann M.'s own consistent lack of cooperation caused her to benefit only minimally from the services, so that she herself impeded DCF's extended efforts to maintaining her relationship with these children.
2. BRIAN P., FATHER OF RAHEENE AND WINSTON B., FATHER OF QUADEACE
As noted on October 30, 1998, the court (Rogers, J.) found that continuing reunification efforts were not appropriate as to Brian P. and Winston B. Given their lack of subsequent contact with the court or DCF, the court further determines in this proceeding that these parents are unable or unwilling to benefit from reunification efforts, within the meaning of § 17a-112 (c)(1).
3. KENNY J., FATHER OF DA-SHON
CT Page 10179
Given his failure to respond to due notice of these proceedings, the court is constrained to conclude that this putative parent is unable or unwilling to benefit from reunification efforts, as contemplated by § 17a-112 (c)(1).
B. STATUTORY GROUNDS FOR TERMINATION
 1. ANN M., THE MOTHER
 a. PARENTAL FAILURE TO REHABILITATE — § 17a-112 (c)(3)(B)
The petitioner claims that Ann M. has failed to benefit from almost seven years of services, supporting the application for termination of Ann M.'s parental rights pursuant to General Statutes § 17a-112 (c) (3)(B).[40] While Ann M. has partially attended to some of the court-ordered expectations, the overwhelming evidence establishes that Ann M. had not accomplished such personal rehabilitation as is contemplated by § 17a-112 (c)(3)(B) either by November 16, 1998 when the TPR petition was filed, or as of the conclusion of this trial. By clear and convincing evidence, the court finds that Ann M. had not, as of either date, achieved such degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her children, she could assume a responsible position in her children's lives.[41] Accordingly, the petitioner has met her burden of proof on this issue.
Honoring its obligation to predict what may happen within a reasonable time after the filing of the TPR petitions, the court also must consider Ann M.'s conduct after November 16, 1998. In this case, a period of approximately two and a half years ensued until the conclusion of trial, during which time Ann M. made no creditable progress in developing the ability to provide appropriate parenting for Raheene, Da-Shon, Quadeace or Hailequasha. As these children require intermittent or on-going mental health and special educational treatment, the issue for this court to determine is thus not merely whether Ann M. has improved her personal status or her ability to serve as a parent in general, but whether she has now "gained the ability to care for the particular needs of the [children] at issue" and whether such rehabilitation is foreseeable within a reasonable time. In re Sarah Ann K., supra, 57 Conn. App. 448.
The evidence in this case clearly and convincingly reveals that substantial rehabilitative efforts were made by a large number of service agencies over a course of many, many years.[42] Nonetheless, Ann M. has not yet developed the ability to be a competent parent to Raheene, DaShon, Quadeace or Hailequasha, and the court cannot reasonably foresee CT Page 10180 her timely acquisition of this capacity. Ann M. has argued that she cooperated with multiple psychological evaluations, attended parenting courses, accepted the assistance of parenting aides, and complied with court orders for on-going personal counseling. While Ann M. may have been treated, she still suffers from debilitating depression, has extremely limited qualities of expression, does not readily communicate love or affection, and thus cannot provide these children with the nurturing, safe and structured environment they so clearly require.
This conclusion is overwhelmingly supported by the opinions of the experts who conducted Ann M.'s serial psychological evaluations:[43] as discussed in Part I. A. 5., the mental health care providers emphatically agree that Ann M. is intrinsically unable either to benefit from services or to provide appropriate parenting for the older children. A review of the copious evidence produced in this matter illustrates the reasonableness and validity of their determination that Ann M. has failed to achieve rehabilitation, and that she will be unable to responsibly parent these children in the reasonably foreseeable future.
In 1994, after Ann M.'s first psychological evaluation, Dr. Adamakos recommended supportive psychotherapeutic services with medication and direct, hands-on assistance so Ann M. could learn safe and effective parenting skills, although he forewarned that the respondent was not likely to cooperate with this process. (Exhibit 8; Testimony of Dr. Adamakos.) Ann M.'s involvement with the IFP program in the fall of 1994 extended the type of intervention recommended by Dr. Adamakos, including services directed at improving her insight into her problems, and enhancing both parenting skills and amenability to more advanced mental health treatment. As noted, however, Ann M. did not respond to the IFP services. Thus, when Dr. Welsh performed Ann M.'s second psychological examination in December of 1995, she was still deficient in parenting skills, judgment, and overall mental health. Dr. Welsh found Ann M. to be "remarkably inept in reading her children, understanding their needs or knowing how to discipline them. She is so out of touch it is difficult to believe, even through counseling she would be able to parent at even a limited level." (Exhibit 9d.)
Supplementing the earlier IFP rehabilitation services, Child Guidance extended its in-home parent aid for counseling during 1996, although Ann M. again failed to respond in a positive manner. After initially declining a mental health assessment and counseling, Ann M. finally attended some of FSW-FST's group and individual therapy sessions from March through November of 1997. However, notwithstanding FSW-FST's efforts at rehabilitation, when Dr. Swenson performed her August 1997 evaluation, Ann M. still demonstrated woefully little ability to interact with the children. She largely held herself separate and apart from the CT Page 10181 children; communicated in only a rudimentary manner; chose not to participate in activities that were pleasurable to them, such as playing in a sandbox or on the floor; and failed to select activities in which all could equally engage. Noting Ann M.'s depression, Dr. Swenson concluded that she still possessed a "limited ability to bond with her children and little understanding of the emotional or structural needs of children She does not have the psychological resources to be able to provide even the most minimal appropriate care for her children. She might be able to learn adequate parenting skills for caring for her [younger children] if provided with sufficient services and if she were willing to participate and trust and make efforts to learn new skills. However, there is little possibility that she could manage the care of all of her children." (Exhibit 10.) In Dr. Swenson's opinion, Ann M.'s personality disorder led to her life-long habit of reticence and uncommunicativeness, and led her to become hostile and oppositional when assistance or treatment was tendered.[44] (Testimony of Dr. Swenson.) This conclusion both explains the lack of Ann M.'s success with rehabilitation services, and ratifies the predictions Dr. Adamakos and Dr. Welsh had made at earlier stages of her treatment.
The next sequence of Ann M.'s rehabilitative services again failed to achieve the results contemplated by § 17a-112 (c)(3)(B), just as IFP, Child Guidance, and FSW-FST had previously failed. Ann M.'s parenting education services from Boys Village, from September of 1998 through April of 1999, largely coincided with the individual counseling she received from Irene I. and her use of medication prescribed by JFS's psychiatrist. Notwithstanding these coalesced efforts, when discontinuing its services, Boys Village Staff found that Ann M. still did "not appear to be a very affectionate parent" (Exhibit A.), and that she was "still in need of additional support in the areas of communication and interaction with [her younger children] Moeties and Johnny Ray."[45]
(Exhibit 23.) She remained unable to perform such basic tasks as properly attending to her children's medical needs, selecting appropriate child care providers, or cooperating with the school's efforts to assist Moeties. (Exhibits 5, 23; see also Exhibit 10.) Boys Village recommended yet additional services for Ann M. such as an in-home parent aide and access to parenting support groups. (Exhibit 23.)
Ann M.'s fourth psychological evaluation took place during the summer of 1999, when she had just started her one-year suspension of counseling with Irene I.[46] At that time, Dr. Rosado determined that Ann M. had still failed to appropriately benefit from available services: he acknowledged her past poor response to rehabilitative efforts, and identified her pattern of inconsistent visitation with the children as evidence of her lack of progress.[47] (Exhibit 11.) At trial, Dr. Rosado cogently observed that after nearly three years of services, CT Page 10182 including antidepressant medication and a full year of individual therapy with Irene I., Ann M.'s depression remained "a cardinal trait that characterized her overall functioning. . . ." (Exhibit 11; Testimony of Dr. Rosado.)
When the status of Ann M.'s untreated depression in 1997 is compared to her treated condition in 1999, it is clear that any progress she has made in developing parenting skills falls short of that which would reasonably encourage a belief that at some identifiable future date she could assume a responsible position in the children's lives. In re Eden F., supra,250 Conn. 706. Considering, the complexity of the children's psychological and educational problems, Dr. Rosado found it very unlikely that successful reunification with Ann M. could occur within a reasonable period of time, even if rehabilitative services continued.[48] (Testimony of Dr. Rosado.) Based on the totality of the evidence received, including the serial, consistent opinions of the evaluating psychologists,[49] this court concurs. Ann M. had still not achieved the ability to overcome the limitations on her parenting abilities caused by: her cognitive limitations; her lack of insight relating to her depression; her difficulties in communicating with others; and her inability to distinguish safe from unsafe relationships, which leads her to reject potential reliable resources while leaving her vulnerable to those who could exploit her. Thus, the very persistence of her depression, despite treatment, indicates the severity and entrenched nature of her condition, which continues to render her unable or unwilling to recognize or attend to the needs of the older children. Ann M. remains functionally unable to make the appropriate parenting judgments which are called for in light of their special emotional and educational needs, and she will not be capable of doing so in the reasonably foreseeable future. (See Exhibit 11; Testimony of Dr. Rosado.)
Ann M.'s lack of rehabilitation is further evinced by her failure to visit with the children as often as DCF permits, a specific expectation set by the court on August 19, 1996.[50] (Exhibit 5.) While failure to comply with a single expectation may not alone indicate lack of rehabilitation, Ann M.'s failure to attend almost half of the scheduled visits clearly confirms the conclusion that despite treatment and appropriate wide-ranging services, she is either unable or unwilling to extend herself to meet the needs of her older offspring. Despite the multiple permutations of mental health, child and home care services offered to her, Ann M. never acquired the ability to incorporate into her regular activities the obligation, nay the privilege, to regularly visit with Raheene, Da-Shon, Quadeace and Hailequasha.
Ann M. raises several arguments in opposing the clear and convincing evidence which supports the finding of failure to rehabilitate in this CT Page 10183 case. First, she claims that the recommencement of treatment with Irene I. in June of 2000, along with anti-depressant medication and the passage of time, have all led her to overcome her debilitating mental health issues, so that she is now prepared to care not only for her multiple younger children, but the four older children. Second, she argues that the psychologists and service providers in this case all lack sufficient education, experience or sensitivity to her reluctance, as an African-American woman, to display emotion in the presence of strangers. Third, Ann M. asserts that by attending counseling and demonstrating improved parenting abilities with the younger children, she has met the requirements of § 17a-112 (c)(B)(3). Ann M.'s fourth and final argument is that DCF failed to provide her with adequate resources for psychiatric treatment, and thus effectively deprived her of the opportunity for meaningful rehabilitation. For the following reasons, the court declines to adopt these arguments.
Ann M. relies primarily upon Irene I. to support her claim that she has significantly overcome her mental health and parenting issues. However, the court finds that this witness's opinions lack objectivity, and thus carry little weight.[51] Irene I.'s descriptions of Ann M.'s mental health challenges differ markedly from the consistent conclusions reached by Dr. Adamakos, Dr. Swenson, Dr. Welsh, and Dr. Rosado.[52] The psychologists' opinions were soundly based upon data they accumulated through testing and/or formal interactional evaluations of Ann M. with the children. In contrast, Irene I. determined that reunification was a viable option based on her limited training and experience, and after a single, brief observation of Ann M. visiting with the four older children in November of 1998. In addition, although Irene I. testified that Ann M. is capable of understanding and managing the older children's special educational and emotional needs, she formed this opinion in the absence of critical information about their diagnoses or treatment histories.[53]
(Testimony of Irene I.) In view of the totality of the related evidence, it is apparent that Irene I. identifies with Ann M., and is thus interested in the outcome of this case. The court concludes that Irene I.'s opinions lack meaningful relation to either the objective evidence of Ann M.'s significant mental-health and parenting needs, or to the special needs of her children. As such, even when it is acknowledged that Irene I. has had the most recent experience with Ann M., her opinions cannot prevail over those of the evaluating psychologists.
Ann M. contends that lack of sensitivity to her racial and ethnic origin prevented the experts, the home care workers, and DCF personnel from understanding that she was capable of demonstrating appropriate and necessary affection for her children, but was reluctant, as an African-American woman, to display emotion in the presence of strangers. Clear and convincing evidence presented at trial established that all the CT Page 10184 psychologists and providers possessed and exercised fair, appropriate sensitivity and empathy in dealing with Ann M.[54] Thus, there is no reasonable basis for accepting Ann M.'s submission that fundamental flaws mar the petitioner's evidence regarding her inability to project the emotion, affection and nurturing communication that her older children require. (See testimony of Dr. Rosado.)
Ann M. further asserts that her attendance at counseling services and her cooperation with Irene I.'s therapy compels the conclusion that she has become rehabilitated. However, this claim is contrary to the law of this state, and to the facts as presented. In assessing whether Ann M. achieved rehabilitation, within the meaning of § 17a-112 (c)(3), the court's "issue . . . is not attendance at [mental health and parenting] services, but instead, whether, as a result of participating in these services, she can assume a responsible position in the lives of the children within a reasonable time." In re Ashley S., supra,61 Conn. App. 666. The critical issue for the court is thus not whether this respondent has improved the quality of her parenting in general, "`but rather whether [she] has gained the ability to care for the particular needs of the [children] at issue.'" In re Sarah Ann K., supra,57 Conn. App. 448, quoting In re Shyliesh H., supra, 56 Conn. App. 180. Ann M.'s depression has persisted despite the interventions of personal counseling and antidepressant medication.[55] Her own testimony clearly establishes that despite years of receiving services, Ann M. has not yet developed appropriate insight into her own mental status or her parenting limitations, and she continues to lack the ability to effectively communicate to her psychologically fragile older children the affection she claims to hold for them. In sum, notwithstanding some improvement in Ann M.'s parenting skills, she has still not "gained the ability to care for the particular needs of the [children] at issue."[56] In re SarahAnn K., supra, 57 Conn. App. 448; see also In re Ashley S., supra,61 Conn. App. 666.
Although Ann M. also claims that any failure in her rehabilitation was caused by DCF's delay in providing her with appropriate mental health care, the facts compel the conclusion that this respondent, by her own choice of priorities, including her election to focus upon Johnny Ray B., Ta'Zaeya H., and Patrick Peat M., failed to make adequate use of proffered services which could have assisted her in demonstrating a genuine sustained effort to become a competent parent for her older children. See In re Deana E., 61 Conn. App. 197, 204, ___ A.2d ___ (2000). Ann M.'s argument that DCF unreasonably delayed in referring her for appropriate treatment seems to imply that DCF was obligated to cajole or force her into compliance with the many levels of counseling support that was offered.[57] As described in Part I. A., the evidence establishes DCF's consistent tender of services designed to help Ann M. CT Page 10185 to understand her need for mental health treatment, and to encourage her cooperation with counseling.[58] However, despite these efforts, Ann M. followed a clear and consistent pattern of rejecting services until she became intermittently affiliated with Irene I. and the JFS psychiatrists. It was Ann M.'s own lack of cooperation and repeated denial of the need for counseling, and not any conduct by DCF or any service provider, that caused any delay in her participation in mental health care services. See In re Deana E., supra, 61 Conn. App. 204.
Thus, clear and convincing evidence compels the conclusion that despite some participation in her therapeutic regimen, Ann M. remains without the qualities necessary to successfully parent her special needs children, and that she lacks the ability to assume a responsible position in the lives of the older children within a reasonable time. In re Ashley S., supra, 61 Conn. App. 666. Accordingly, the court finds, by clear and convincing evidence, that the petitioner has proved Ann M.'s failure to achieve rehabilitation pursuant to § 17a-112 (c)(3)(B).
b. ACTS OF OMISSION OR COMMISSION — § 17a-112 (c)(3)(C)
The petitioner also claims that the statutory ground of act of omission or commission exists in this case, so that Ann M.'s parental rights should be terminated pursuant to General Statutes § 17a-112 (c)(3) (C).[59] Specifically, the petitioner asserts "that the acts preceding the children's removal from the mother's care, her failure to visit the children consistently and her failure to take the necessary steps to have the children returned to her sole care, subsequent to their removal and placement in DCF's foster care, deprived the children from stability and caused them serious emotional injuries."[60] The court finds this issue in favor of the petitioner.
The clear and convincing evidence establishes that Ann M.'s failure to provide an adequate pattern of visitation, from the date of the neglect adjudication through the filing of the TPR petition on November 16, 1998, caused each of her children to sustain a serious degree of emotional harm.[61] As noted in Part I. E., the evidence consistently establishes that Ann M.'s sporadic visitation pattern caused the children to suffer depression, anxiety and behavioral difficulties, requiring suspension of Ann M.'s visitation and necessitating intensive and long-term professional treatment. The therapists' professional opinions were mirrored by the observations of the foster parents[62] and DCF social workers.[63] Moreover, the cumulative evidence clearly and convincingly establishes a repeated temporal relationship between Ann M.'s inconsistent and ineffective pattern of visitation and the negative, destructive behaviors displayed by her children. The court is also cognizant of the fact that the children's fragile emotional CT Page 10186 conditions and learning disabilities render them to be less resilient in dealing with the stress of their mother's inconsistent visits than other children might be. (Testimony of Dr. W.)
It is well settled that "Section 17a-112 authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to a child." (Emphasis added.) In re Antonio M., 56 Conn. App. 534, 543, 744 A.2d 915 (2000). See also In re Sean H., 24 Conn. App. 135, 144, 586 A.2d 1171 (1991) (language of the statutory predecessor to § 17a-112 (c)(3)(C) does not limit the grounds to acts resulting in physical injury). Our Appellate Court has tacitly confirmed that a parent's failure to visit consistently, when accompanied by an adverse emotional effect on the child, effectively satisfies the elements of In re Caroline M.,39 Conn. App. 904, 655 A.2d 178 (1995), affirming In re Caroline M., Superior Court for Juvenile Matters at Montville (Aug. 3, 1994, Handy,J.) (statute [§ 17a-112 (c)(3)(C)] satisfied where petitioner proved that mother's omission of "acts of consistency in Caroline's life . . . greatly affected both her level of comfort and security.")
The children's significant mental health and emotional problems were substantially caused in this case "by reason of" Ann M.'s acts or omissions with regard to her visitation. Her children were thereby denied "the care, guidance or control necessary for [their] physical, educational, moral or emotional well-being." § 17a-112 (c)(3)(C). As the clear and convincing evidence establishes the requisite nexus between her acts or omissions and the general harm contemplated by the statute, the petitioner has met her burden of proof on this issue. In reAntonio M., supra, 56 Conn. App. 543.
2. BRIAN P., FATHER OF RAHEENE
 a. ABANDONMENT — § 17a-112 (c)(3)(A)
The petitioner claims that Brian P., had abandoned Raheene as of November 16, 1998, within the meaning of General Statutes § 17a-112
(c)(3)(A).[64] Applying the requisite legal standards,[65] the court finds this matter in favor of the petitioner.
The uncontroverted evidence in this case establishes that Brian P. only occasionally visited with this child, and that he sent only one letter to him during all the years Raheene was in foster care, but sent him no gifts and made no telephone calls.[66] Brian P. failed to permit a home visit, and has failed to attend scheduled meetings with DCF, at which information concerning his parenting abilities was to have been determined. He failed to attend a court ordered interactional study with CT Page 10187 Raheene, further demonstrating his inability or unwillingness to serve as a responsible caretaker for this child. (Exhibit 4.) He last made a voluntary support payment for Raheene in 1996; last provided any financial support through a 1998 income tax lien; maintains a large support arrearage; and has failed to report his whereabouts to the state's support enforcement agency. (Testimony of Matthew B.) The evidence clearly and convincingly reveals that Brian P. has failed the test of meeting "[t]he commonly understood obligations of parenthood" established by In re Deana E., supra, 61 Conn. App. 193.
Brian P.'s unflagging protest that he maintains valid interest and concern in Raheene was unaccompanied by credible evidence to support this claim.[67] His interest in Raheene, if any, is merely sporadic in nature, not apparent on a consistent and continuing basis. In re DeanaE., supra, 61 Conn. App. 193; In re Shane P., 58 Conn. App. 244, 256, ___ A.2d ___ (2000). Accordingly, based on clear and convincing evidence, the court finds that Brian P. has abandoned Raheene, within the meaning of § 17a-112 (c)(3)(A).
b. PARENTAL FAILURE TO REHABILITATE — § 17a-112 (c)(3)(B)
The petitioner claims that the statutory ground of parental failure to rehabilitate supports the application for termination of Brian P.'s parental rights pursuant to § 17a-112 (c)(3)(B). The court finds this issue in favor of the petitioner.
The clear and convincing evidence establishes that Brian P. had not succeeded with personal rehabilitation either as of November 16, 1998 or as of the conclusion of this trial, nor had he achieved such degree of rehabilitation as would encourage the belief that within a reasonable time, considering Raheene's age and needs, he could assume a responsible position in his son's life. This conclusion is supported by Brian P.'s persistent high level of anger which was apparent upon discharge from LMG in September 2000, just prior to the commencement of trial. See Part I. B. Furthermore, Brian P. was released from treatment without appropriate skills to address his education, employment and housing issues, which remained "stressors" in his life. (Exhibit D.) Under these circumstances, it would be unreasonable to conclude that Brian P.'s attendance at the LMG program rendered him either rehabilitated and able to serve as an appropriate parent for Raheene, or committed to meeting to this child's special needs. Accordingly, the court finds this matter clearly and convincingly proved in favor of the commissioner. In reAshley S., supra, 61 Conn. App. 666.
c. No ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112 (c)(3)(D)
CT Page 10188
The petitioner further claims that because no ongoing parent-child relationship existed at any time as to Raheene and his father, Brian P.'s parental rights should be terminated pursuant to General Statutes § 17a112(c)(3)(D).[68] The court finds this issue in favor of the petitioner.
When addressing a claim based on § 17a-112 (c)(3)(D), the court conducts a two-pronged analysis. First, the court must determine whether a parent-child relationship exists, and second, the court must look into the future and determine if it would be detrimental to the child's best interest to allow time for such a relationship to develop. (Citations omitted.) In re John G., 56 Conn. App. 12, 22, 740 A.2d 496 (1999). "In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Citations omitted.) Id., 23.
The clear, convincing, and uncontroverted evidence in this case establishes that there is no extant parent-child relationship between Brian P. and Raheene as, since at least 1997, others have "met on a day to day basis the physical, emotional, moral and educational needs of the child." In re Deana E., supra, 61 Conn. App. 195. Raheene apparently maintains memories of Brian P. (Testimony of James R.) However, these feelings do not arise from any realistically based parental love or affection. Given Raheene's long history of emotional and educational difficulties, which appear to have been tempered at this time, this child's acknowledged need for permanency, and Brian P.'s history of substance abuse and criminal activity, the court must logically conclude that any efforts at reunification with Brian P. would add an unreasonable element of stress and uncertainty into Raheene's life, without a known, beneficial outcome. As such, the evidence supports the conclusion that it would be detrimental to Raheene's best interest to allow time to develop a parentchild relationship with Brian P. In re John G., supra,56 Conn. App. 22. Thus, the petitioner has met her burden of proof under § 17a-112 (c)(3)(D), by clear and convincing evidence.
3. KENNY J., FATHER OF DA-SHON
 a. ABANDONMENT — § 17a-112 (c)(3)(A)
The petitioner claims that Kenny J. had abandoned Da-Shon as of June 5, 2000, supporting the termination of his parental rights pursuant to § 17a-112 (c)(3)(A). Based on the principles of law as set forth in Part II. 2. a., the court finds this matter in favor of the petitioner.In re Deana E., supra, 61 Conn. App. 193. CT Page 10189
The uncontroverted evidence in this case establishes that Kenny J. has neither called to inquire about the well-being or progress of Da-Shon. nor has he visited, sent cards, letters or gifts, nor paid any support for him. Kenny J. has no relationship with his son, and he has abandoned this child in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to Da-Shon's welfare. The evidence clearly and convincingly discloses that Kenny J. has failed to maintain a reasonable degree of interest in the Da-Shon's welfare as contemplated by In re Deana E., supra, 61 Conn. App. 193 and In re ShaneP., supra, 58 Conn. App. 256. Thus, by clear and convincing evidence, the petitioner has met her burden of proving abandonment pursuant to §17a-112 (c)(3)(A).
b. No ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112 (c)(3)(D)
The petitioner further claims that no ongoing parent-child relationship existed in this case as to Da-Shon and his father as of June 5, 2000, further supporting the termination of Kenny J.'s parental rights pursuant to § 17a-112 (c)(3)(D). Based on the principles of law as set forth in Part II. 2. c., the court finds this matter in favor of the petitioner. See In re John G., supra, 56 Conn. App. 22, 23; see also In reDeana E., supra, 61 Conn. App. 195.
The clear and convincing evidence in this case establishes that there is absolutely no ongoing parent-child relationship between Kenny J. and Da-Shon, in terms of the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of this child. Kenny J. has not participated in these proceedings, notwithstanding the due notice provided to him. He has not attempted to establish himself as an individual who is interested in or able to provide for his son's daily needs, nor has he supported Da-Shon financially. This child, who requires permanency in his placement, does not even know Kenny J., has no present memories of him, does not regard him as a paternal figure and, sadly, has presumed that another man was his father. (Exhibit 4.). Allowing further time for the development of a parent-child relationship would be confusing at best, and likely devastating to Da-Shon's best interests, given his fragile emotional state. By the clear and convincing evidence, the petitioner has met her burden of proving the lack of an ongoing parent-child relationship between Kenny J. and Da-Shon, within the meaning of this statute. § 17a-112 (c)(3)(D).
4. WINSTON B., FATHER OF QUADEACE
 a. ABANDONMENT — § 17a-112 (c)(3)(A)
CT Page 10190
The petitioner asserts that Winston B. has abandoned Quadeace prior to November 16, 1998, supporting the application for termination of his parental rights pursuant to § 17a-112 (c)(3)(A). Based on the principles of law as set forth in Part II. 2. a., the court finds this matter in favor of the petitioner. In re Deana E., supra,61 Conn. App. 193.
The uncontroverted evidence establishes that Winston B. has never acknowledged paternity of this child; appeared in juvenile court in relation to the pending neglect or termination matters; called DCF to inquire about the well-being or progress of Quadeace; telephoned, sent any cards, letters or gifts to her; nor paid any support for her. Between August of 1997 and April of 1999, Winston B. made only two attempts to visit with Quadeace, on both occasions appearing unannounced at her foster home. (Exhibit 4.) The clear and convincing evidence discloses that he has neither established nor maintained a relationship with his daughter, and he has abandoned this child in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to her welfare. Accordingly, the court finds by clear and convincing evidence that the petitioner has met her burden of proving that Winston B. has abandoned Quadeace, within the meaning of § 17a-112 (c)(3) (A).
b. No ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112 (c)(3)(D)
The petitioner further claims that no ongoing parent-child relationship existed between Quadeace and her father as of November 16, 1998, supporting the application for termination of Winston B.'s parental rights pursuant to § 17a-112 (c)(3)(D). Based on the principles of law as set forth in Part II. 2. c., the court finds this matter in favor of the petitioner. See In re John G., supra, 56 Conn. App. 22, 23; see also In re Deana E., supra, 61 Conn. App. 195.
The clear and convincing evidence in this case establishes that there is absolutely no ongoing parent-child relationship between Winston B. and Quadeace, in terms of the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child. To allow further time for the establishment or reestablishment of such a parent-child relationship would be no doubt futile, given Winston B.'s lack of participation in this matter: it would clearly be detrimental to Quadeace's best interests. Accordingly, by clear and convincing evidence, the court finds this issue in favor of the petitioner. §17a-112 (c)(3)(D).
 III. DISPOSITION
CT Page 10191
As to the dispositional phase of this hearing,[69] the court has considered the evidence relates to circumstances and events up to and including the close of trial.
A. SEVEN STATUTORY FINDINGS — § 17a-112 (d)
In determining whether to terminate the parents' rights in this case, the court has considered the evidence and information relevant to each of the following seven findings, which are based ox clear and convincing evidence. In re Jonathan G., 63 Conn. App. 516, 527-29 ___ A.2d ___ (2001)
1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112 (d)(1)
DCF provided Ann M. and her children with appropriate services, as thoroughly discussed in Parts I. and II. B. 1. (See also Exhibits 4, 40, Q, R; Testimony of Michelle C.) In providing these services, DCF complied with its obligation to take Ann M.'s mental condition into consideration where determining what "reasonable efforts" to make at reunification. Inre Antony B., 54 Conn. App. 463 475, 735 A.2d 893 (1999). DCF also provided extensive case management services to Ann M. transportation and visitation supervision, and assisted her with housing. (Exhibit 5, KK; Testimony of Michelle C.)
The evidence supports the reasonableness of DCF's failure to offer any services to Brian P. Kenny J., or Winston B., who have had little or no contact-with their children. As noted above, or October 30, 1998, the court (Rogers, J.) ruled that reunification efforts involving Brian P. and Winston B. were no longer in the best interests of Raheene or Quadeace. (Exhibit 4.) Kenny J. has never evinced interest in or commitment to Da-Shon, has never appeared in court, and has never made himself known to DCF, leading to the conclusion that any extension of services to him would have been fruitless.[70]
2. EFFORTS AT REUNIFICATION PURSUANT TO FEDERAL LAW — § 17a-112(d)(2)
DCF made reasonable efforts to reunite Ann M. and these children pursuant to applicable federal law, given the situation and circumstances here existing. See Parts II. A. 1. and III. A. 1. DCF's institution of termination proceedings is consistent with the federal law which limits foster care drift and to secure permanent placement for children who are in foster care.
As noted, on October 30, 1998, the court (Rogers, J.) found that CT Page 10192 continuing reunification efforts were not appropriate as to Ann M., Brian P. and Winston B. (Exhibit 4.) Given Kenny J.'s lack of response to notice of these proceedings, the court concludes that he is unwilling or unable to respond to reasonable reunification efforts.
3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (d)(3)
The court ordered reasonable expectations for Ann M.'s rehabilitation and reunification on August 19, 1996. (Exhibit 5.) The evidence reflects Ann M.'s partial but ineffective compliance with these expectations, as discussed in Part II. B. 1. (See also Exhibit 3.)
No specific steps were issued for the fathers at issue in this matter. Brian P. failed, however, to attend his court-scheduled psychological evaluations by Dr. Rosado. (Exhibit 11.)
4. FEELINGS AND EMOTIONAL TIES OF THE CHILDREN — § 17a-112 (d)(4)
Although the children identify Ann M. as their mother, and are often happy to see her, no measurable, significant attachment exists between the children and this respondent. (Exhibit 11.)[71]
Raheene and Da-Shon have been in non-relative foster care for almost four years. They an firmly bonded with their foster parents. (Exhibits 4, 11; Testimony of Karen M., Dr. W.) These boys rarely speak about their mother, whom they call Ann, but they occasionally speak of their fathers.
Quadeace and Hailequasha have been in foster care for five years. While they are happy to see Ann M., they are very strongly attached to their foster mother, who is a "loving and supportive parent who provides a nurturing home, and who has sought out help when needed, and responsibly followed through with treatment recommendations." (Exhibits 22; see also Exhibit 37; Testimony of Dr. K.) Hailequasha has stated her desire to live with her foster mother, although she also wishes to maintain contact with Ann M. (Exhibit 22.; Testimony of Cookie P.)
Although Raheene has received one letter from Brian P. and has mentioned him once or twice, he maintains no strong ties or parental regard for him. (Testimony of Karen M.) Da-Shon has no knowledge or recollection of Kenny J., and does know him as a parent. (Exhibit 4; Testimony of Karen M.) Quadeace has no knowledge or recollection of Winston B., and does not recognize him in any way. (Exhibit 4.)
5. AGES OF THE CHILDREN — § 17a-112 (d)(5)
CT Page 10193
Raheene is thirteen years old; Da-Shon is twelve; Quadeace is ten and a half, and Hailequasha is nearing her ninth birthday.
6. EFFORTS MADE TO ADJUST PARENTS' CIRCUMSTANCES — § 17a-112(d)(5)
Ann M. has failed to make realistic and sustained efforts to conform her conduct to acceptable parental standards insofar as her older children are concerned. While she has participated to a degree in the various rehabilitative programs and counseling, Ann M.'s persistent hostility, compounded with her failure to cooperate with service providers was described in Parts I. A., B., C. and Part II. B. 1. a
Brian P. failed to make realistic and sustained efforts to conform his conduct to acceptable parental standards. His failure to maintain a relationship with his child, compounded by his incarceration and his limited recovery from his substance abuse problem, has caused him to be displaced as a parental figure for Raheene.
The evidence permits the clear and convincing inference that neither Kenny J. nor Winston B. effectively attempted to conform his conduct to acceptable parental standards.
7. PREVENTION FROM MAINTAINING RELATIONSHIPS — § 17a-112 (d)(6)
Although Ann M. has complained that DCF took unreasonable steps to keep her from seeing her children in placement, the evidence does not support this conclusion, except with regard to the limiting effects inherent in the foster care system. (See Exhibits B, S.) Prior to the therapeutic suspension of her visits, as described in Part I. E. Ann M. chose not to consistently visit the children
Although Brian P. claims that his incarceration and his in-patient rehabilitation prevented him from maintaining a relationship with Raheene, any impediments were occasioned by Brian P.'s own conduct, not by any person or agency acting on behalf of his child.
Neither Kenny J. nor Winston B. were prevented from maintaining a relationship with their children by any person or factor contemplated by § 17a-112 (d)(6).
B. BEST INTERESTS OF THE CHILDREN — § 17a-112 (c)(2)
The court is next called upon to decide whether terminating the parental rights of Ann M. Brian P., Kenny J. and Winston B. would be in CT Page 10194 the best interests of Raheene, Da-Shon, Quadeace and Hailequasha.[72]
Considering the totality of the evidence presented and applying the requisite legal standards, the court concludes that granting the TPR petitions will most effectively serve these children and their special needs.[73]
In reaching this conclusion, the court acknowledges that despite their response to medication and individual therapy, each of Ann M.'s older children suffers from serious emotional disorders. Their complex mental health needs have caused significant disruptive behavior in the classroom and at home, requiring structured treatment at hospital-based facilities such as R.E.A.C.H. and the Housatonic program and thorough follow-up care after discharge. Raheene seems, for the time being, to have developed remarkable control over his underlying emotional issues.[74] However, he and his siblings require vigilant care, attention and consistent, reliable guidance from parental figures to optimize their continuing recovery.
Ann M. is clearly unable to fulfill this parental role now, and there is no reasonable basis upon which the court could conclude that she would be able to do so at any foreseeable point in the future Historically, Ann M. has been unable or unwilling to express any meaningful amount of physical or verbal affection for Raheene, Da-Shon, Quadeace or Hailequasha. She has never displayed leadership. provided guidance, or demonstrated instrumental behavior when interacting with her older children. Her sporadic appearance at a school or church function, or her occasional gifts of clothing and money, cannot substitute for the comfort of a mother's welcoming greeting, warm embrace, loving kisses, enthusiastic support for a child's success, or soothing words when the vicissitudes of life are encountered.
It is clear that the respondent loves all her children and desires to gain custody of those not now in her care. (Exhibits 11, 43; Testimony of Ann M.) See In re Ashley S., supra, 61 Conn. App. 667. However, Ann M. has long been overwhelmed by her lifestyle, her own mental health and personality issues, her many children, their special needs, and her inability to protect and provide for them. (Testimony of Susan B.; Dr. Welsh.) As a result of the plethora of parenting services provided to her, Ann M. learned to maintain a clean and orderly home for the youngest children who remain in her custody, became better able to facilitate their medical care, and to demonstrate some limited signs of affection. (Exhibits 11, 43; Testimony of Irene. I.) This improvement, even when complemented by Ann M.'s "love and biological connection . . . is simply not enough" to meet the best interests of the special needs children, Raheene, Da-Shon, Quadeace and Hailequasha. In re Ashley S., supra,61 Conn. App. 667. Ann M.'s fundamental depression, compounded by he CT Page 10195 personality structure, rendered the rehabilitation process protracted and generally unsuccessful profoundly limited her ability to parent these children, and militates in favor of termination. "Termination has been consistently recognized as being in the best interest of the child when the parent has a mental deficiency or illness which renders her unable to provide the child with necessary care." (Quotation marks omitted.) In reAntony B., supra, 54 Conn. App. 473.
Although due consideration has been given to their biological ties to Ann M., the evidence clearly and convincingly establishes that the children now reside in nurturing, stable environments where they receive individualized care and attention, and support of their special needs. As Dr. Rosado has indicated, the children's best interests will be met by allowing them to remain in their current placements, not by returning them to Ann M.'s home with their other siblings.[75] (Exhibit 11; Testimony of Dr. Rosado.) As he opined, the children "[a]ll have special needs (to varying degrees), creating a formidable challenge for any parent or family. It would be inadvisable to try and integrate them into a family with four other children (who may or may not also have special needs), especially considering that [Ann M.] has characteristics of depression." (Exhibit 11.) Even Irene I. acknowledged the stress that would be added to Ann M.'s life if she were to serve as the parent for the four older children, and admitted that this stress would be compounded if Ann M. were to become employed. (Testimony of Irene I.) On balance, as Dr. Rosado has observed, the children's placement is optimal, and should not be changed, even if long-term foster care results, rather than adoption, and even if contact between the sisters and the brothers, or with their biological parents is thereby minimized or eliminated. (See Testimony of Dr. Rosado.)
As to the fathers who are subject to this petition, the evidence clearly and convincingly establishes that these children all require a high level of parenting skills in order to provide them with a structured and supportive residential environment which will effectively complement the special education services they receive in school. The evidence permits the clear and convincing inference that neither Brian P., Kenny J. nor Winston B., has the capacity or commitment requisite to acquiring those high level skills. Accordingly, their children's best interests cannot be served by continuation of their parental rights.
While all children require permanency, this status is even more critical for the special needs children at issue in this case, as they lack the resiliency to enable them to cope with the diminished parental attention that would necessarily result if they were removed from their current, familiar environments. (Testimony of Dr. Rosado.) Any change in placement or structure for Raheene Da-Shon, Quadeace and Hailequasha, or CT Page 10196 any introduction of instability or disorganization in their home lives, would create an unacceptable potential for increasing the risk of exacerbating their emotional illnesses. (Testimony of Dr. Rosado, Dr. W., Dr. K.; see Exhibits 18, B, E.) The children's counsel and GAL affirms that their interests will best be served by maintaining placement in the secure environments of their current foster homes, where they are well supervised, parented and loved, and where their special needs are consistently addressed.[76] The psychologists and children's therapists all confirm that the children have waited far too long for permanence, and that they cannot tolerate even a year, which would minimally be required for transition to residence with Ann M. James and Orly R., as well as Cookie P., have indicated they wish to adopt their foster children. (Testimony of Michelle C., James R., Cookie P.) Adoption, which will best enable the children to continue to gain emotional strength as they emerge into adulthood, is made possible by the timely termination of the parental rights at issue in this case. (Exhibits 14, 22, 38; Testimony of Dr. W., Dr. K.)
 IV. ORDER OF TERMINATION
WHEREFORE, the court having found by clear and convincing evidence that the petitioner has prevailed on the statutory grounds alleged against Ann M., and having further determined, upon all of the facts and circumstances presented, that it is in the best interests of Raheene, Da-Shon, Quadeace and Hailequasha that her parental rights be terminated, the court accordingly ORDERS the termination of Ann M.'s parental rights to these children.
AND WHEREFORE, the court having found by clear and convincing evidence that the petitioner has prevailed on the statutory grounds alleged against Brian P., and having further determined, upon all of the facts and circumstances presented, that it is in the best interests of Raheene to terminate his biological father's parental rights, the court accordingly ORDERS the termination of Brian P.'s parental rights to this child.
AND WHEREFORE, the court having found by clear and convincing evidence that the petitioner has prevailed on the statutory grounds alleged against Kenny J., and having further determined, upon all of the facts and circumstances presented, that it is in the best interests of Da-Shon to terminate his putative father's parental rights, the court accordingly ORDERS the termination of Kenny J.'s parental rights to this child.
AND WHEREFORE, the court having found by clear and convincing evidence that the petitioner has prevailed on the statutory grounds alleged against Winston B., and having further determined, upon all of the facts CT Page 10197 and circumstances presented, that it is in the best interests of Quadeace to terminate her biological father's parental rights, the court accordingly ORDERS the termination of Winston B.'s parental rights to this child.
AND WHEREFORE the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for all four children, for the purpose of securing adoptive homes or long-term placement where Raheene P. and Da-Shon M. reside together, and where Quadeace B. and Hailequasha E. reside together. The court directs that the children's current foster families be giver first consideration in any adoption, as is presently the DCF plan for these children.
The court further ORDERS that within thirty days of this judgment a written report addressing such permanency plan shall be submitted by the Commissioner, and that such further reports shall b filed by DCF as are required by state and federal law.
BY THE COURT,
N. Rubinow, J.